UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

```
MICHAEL MARCELLE                          CIVIL ACTION

v.                                        NO. 12-2762

SOUTHERN FIDELITY INSURANCE COMPANY       SECTION "F"
```

ORDER AND REASONS

Before the Court is Southern Fidelity Insurance Company's Motion for Summary Judgment. For the reasons that follow, the motion is GRANTED.

Background

This insurance coverage dispute arises from damage to a house caused by the accumulation of guano[1] in and below the attic, which had become a bat roosting colony.

Michael Marcelle owns property located at 7060-62 Boston Drive in New Orleans, Louisiana. Southern Fidelity Insurance Company issued an insurance policy covering the property, with dwelling limits of $133,100.00, subject to a $2,500.00 deductible. The policy insured the house against "direct physical loss." However, the SFIC policy contains two exclusions relevant to the coverage issue presented in this matter. The first relevant exclusion

---

[1] Guano, as defined by The American Heritage Dictionary of the English Language, is "[a] substance composed chiefly of the dung of seabirds or bats, accumulated along certain coastal areas or in caves and used as fertilizer."

excludes from coverage damage to property caused by "pollutants." Specifically, the policy states that it does not "insure loss...[c]aused by...[d]ischarge, dispersal, seepage, migration release or escape of pollutants." The policy, in turn, defines "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot fumes, acids, alkalis, chemicals and waste." The term "waste" is defined to "include[] materials to be recycled, reconditioned or reclaimed." The second relevant exclusion excludes from coverage "loss...[c]aused by...[b]irds, vermin, rodents, insects or domestic animals."

On February 13, 2012 Marcelle discovered that the attic in his property had been invaded, and damaged, by a colony of bats. Shortly thereafter on February 22, 2012 Marcelle notified SFIC to make a claim for the damage. That same day, SFIC confirmed receipt of Marcelle's notice of loss. One week later, on February 29, 2012, Mitash Patel of Trinity Insurance Services, an independent adjuster acting on behalf of SFIC, inspected Marcelle's property. On March 8, 2012 Trinity sent Marcelle its Final Report, in which it noted that the insurance policy "does not extend coverage" for "any cost for bat removal and mitigation." A few days later on March 13, 2012 SFIC notified Marcelle that it had denied his claim.

Marcelle disputed SFIC's denial of coverage, contending by letter that bats are not "vermin", and therefore the damage caused by them is covered by the SFIC policy. However, on May 3, 2012

SFIC confirmed its initial denial of coverage, noting "the policy does not extend coverage for the removal of the bats, or vermin, and no direct physical loss to property was found."

Meanwhile, Marcelle hired Parker Wildlife Control to inspect his property and to provide damage assessment and remediation. Parker Wildlife's report explains that the walls of the building were being used as a roost site, and that the bats had gained access through the metal cap of the exterior brick wall and other crevices in the building. The report also noted that "[t]he interior building has an odor primarily associated with bat urine that would require removal of the soiled insulation in vertical walls, as well as guano and urine on the backside of the vertical brick walls." Ultimately, Parker Wildlife removed the bat colony from Marcelle's house. Parker Wildlife recommended sanitizing "areas of entry and roosting entry to break down urine and guano" and cleaning the guano and urine from the exterior brick walls.

On October 3, 2012 Marcelle sued SFIC in state court seeking to recover (1) losses incurred as a result of damage to his property caused by bats; and (2) statutory penalties pursuant to La.R.S. 22:1892 and 22:1973 for arbitrary and capricious denial of his claim and for breach of the statutory duty of good faith and fair dealing. SFIC was served on October 16, 2012. On November 14, 2012 SFIC removed the lawsuit to this Court, invoking the Court's diversity jurisdiction. Invoking the policy's pollutant

3

and vermin exclusion clauses, SFIC now seeks summary relief in its favor, dismissing the plaintiff's claims.

I.

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law. No genuine issue of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio., 475 U.S. 574, 586 (1986). A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. See id. Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. Id. at 249-50 (citations omitted). Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992). Rather, he must come forward with

competent evidence, such as affidavits or depositions, to buttress his claims. Id. Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987); Fed.R.Civ.P. 56(c)(2). Finally, in evaluating the summary judgment motion, the Court must read the facts in the light most favorable to the non-moving party. Anderson, 477 U.S. at 255.

## II.
### A.

According to Louisiana law,[2] an insurance policy is a contract that must be construed using the general rules of contract interpretation set forth in the Civil Code. See Cadwallader v. Allstate Ins. Co., 848 So.2d 577, 580 (La. 2003). The Court's role in interpreting contracts is to determine the common intent of the parties. La. Civ. Code art. 2045. In determining common intent, pursuant to Civil Code article 2047, words and phrases used in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning. See Henry v. South Louisiana Sugars Co-op., Inc., 957 So.2d 1275, 1277 (La. 2007) (citing Cadwallader, 848 So.2d at 580). "When the words of a contract are clear and explicit and lead to no absurd consequences, no further

---

[2]There is no dispute that Louisiana law governs this diversity case.

5

interpretation may be made in search of the parties' intent" (La. Civ. Code art. 2046), and the agreement must be enforced as written.  Hebert v. Webre, 982 So.2d 770, 773-74 (La. 2008).  The Court's approach to a contract's meaning is driven by simple common sense principles.

Courts should not interpret insurance policies in an unreasonable or a strained manner so as to enlarge or to restrict policy provisions beyond what is reasonably contemplated by the terms or so as to achieve an absurd conclusion.  South Louisiana Sugars Cooperative, 957 So.2d at 1277 (citation omitted).  Unless it conflicts with state law or public policy, an insurance policy may limit an insurer's liability and impose and enforce reasonable conditions upon the policy obligations the insurer contractually assumes.  Id. at 1277-78 (citations omitted).

A policy provision that is susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective.  La. Civ. Code art. 2049.  Further, the policy should be construed as a whole and one portion should not be construed separately at the expense of disregarding another.  See La. Civ. Code art. 2050; see also Hebert, 982 So.2d at 774 (citations omitted).

If an ambiguity remains after the Court applies the general rules of construction, the ambiguous contractual provision is to be construed against the insurer and in favor of coverage.  Henry, 957

So.2d at 1278 (citing Cadwallader, 848 So.2d at 580). Under this rule of strict construction, equivocal provisions seeking to narrow an insurer's obligation are strictly construed against the insurer. Id. (citing Louisiana Ins. Guar. Ass'n v. Interstate Fire & Casualty Co., 630 So.2d 759, 764 (La. 1994) and Garcia v. St. Bernard Parish School Board, 576 So.2d 975, 976 (La. 1991)). For the rule of strict construction to apply, the ambiguous insurance policy provision must be not only susceptible to two or more interpretations, but each of the alternative interpretations must be reasonable. Id. (citing Cadwallader, 848 So.2d at 580).

*B.*

1.

In Louisiana, insurers must conform to their obligations to adjust and pay claims in good faith, or they must face the consequences in the form of paying penalties to their insureds. Louisiana Revised Statute § 22:1982(A)(1) provides that insurers must "pay the amount of any claim due any insured within thirty days after receipt of satisfactory proof of loss from the insured ...." An insurer is liable for damages and for statutory penalties, attorney's fees, and costs if its failure to pay is "arbitrary, capricious, or without probable cause." La.R.S. § 22:1892(B)(1). Similarly, La.R.S. § 22:1973 requires insurers to pay "the amount of any claim due within sixty days after receipt of satisfactory proof of loss"; an insurer breaches this duty "when

such failure is arbitrary, capricious, or without probable cause." La.R.S. § 22:1973(B)(5).  If the insurer fails to pay within this time frame, it is liable for "any damages sustained as a result of the breach and may be liable for penalties of up to twice the damages sustained."  La.R.S. § 22:1973(A), (C).  "The conduct prohibited [by these penalty statutes]," the Louisiana Supreme Court has observed, "is virtually identical."  <u>Reed v. State Farm Mutual Automobile Ins. Co.</u>, 857 So.2d 1012, 1020 (La. 2003). Because the statutes are penal in nature, they must be strictly construed.  <u>Id.</u>  (citation omitted).

 To recover penalties under these statutes, the insured bears the burden of  of proving:

  (i)  that the insurer received a satisfactory proof of loss,
  (ii)  that the insurer failed to pay the claim within the applicable statutory period, and
  (iii)  that the insurer's failure to pay was arbitrary and capricious.

<u>Grilleta v. Lexington Ins. Co.</u>, 558 F.3d 359, 368 (5th Cir. 2009)(citations omitted).  To prove that the insurer's failure to pay was "arbitrary and capricious", the insurer must submit "clear proof" that the insurer's refusal to pay was "vexatious", which has been defined as "unjustified, without reasonable or probable cause or excuse."  <u>Reed</u>, 857 So.2d at 1021 (instructing that the bad faith conduct captured by the penalty statutes "describe[s] an insurer whose willful refusal of a claim is not based on a good-faith defense").  Therefore, "statutory penalties are inappropriate

8

when the insurer has a reasonable basis to defend the claim and acts in good-faith reliance on that defense." Id. (citing Rudloff v. Louisiana Health Services and Indemnity Co., 385 So.2d 767, 771 (La. 1980)).

The inquiry into whether an insurer's refusal to pay is vexatious is a factual issue;[3] thus, summary judgment will not be appropriate when a claim for bad faith penalties depends on factual determinations underlying the reasonableness of the insurer's refusal to pay. See Johnson v. State Farm Mutual Automobile Ins. Co., No. 11-1991, 2012 WL 1745497, at *4 (E.D. La. May 16, 2012)(Africk, J). However, when an insurer seeks summary judgment on a statutory penalties issue -- an issue on which the insured will bear the burden of proof at trial -- the insured must offer some evidence in support of their bad faith claim to defeat summary judgment. See id. (granting summary judgment in insurer's favor when plaintiffs failed to submit facts showing that the insurer lacked a reasonable basis to investigate and defend against the claim); see also, e.g., DeFrancesch, M.D., L.L.C. v. Employers Mut. Cas. Co., No. 06-5920, 2008 WL 1930450, at *4 (E.D. La. Apr. 30, 2008)(Engelhardt, J.); Gates v. Auto Club Family Ins. Co., No. 06-4394, 2007 WL 1464259, at *3 (E.D. La. May 17, 2007)(Vance,

---

[3] Indeed, "[w]hether or not a refusal to pay is arbitrary, capricious, or without probable cause depends on the facts known to the insurer at the time of its action." Scott v. Ins. Co. of North America, 485 So.2d 50, 52 (La. 1986).

J.)(granting summary judgment when plaintiffs failed to submit any facts indicating that the insurer's conduct was vexatious).

2.

The plaintiff alleges that the defendant breached the homeowner's insurance contract and its statutory obligations of good faith claims adjustment. SFIC counters that, even if the Court determines that SFIC's adjustment of the claim was incorrect, the plaintiff has failed to submit any evidence that could provide a basis for concluding that it acted arbitrarily, capriciously, or without probable cause. The Court agrees.

The record shows that SFIC sent an adjuster to the plaintiff's property within six days of being notified of the loss. SFIC completed its adjustment of the claim within 30 days. SFIC denied the claim based on what it says are clear and unambiguous exclusions in the policy. All that the record reveals is a coverage dispute.

The plaintiff submits no evidence to support his claim for statutory penalties, an issue on which he will bear the burden of proof at trial. Instead, the plaintiff suggests only that he is entitled to present to the jury his claim that the defendant's denial of coverage was so unreasonable that it constituted bad faith. He would be so entitled had he submitted any evidence raising a material issue of fact respecting whether SFIC acted vexatiously in denying his claim. But the plaintiff submitted

nothing. Summary judgment is proper if, as here, the party opposing the motion fails to establish an essential element of his case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The plaintiff cannot simply deny the allegations raised by the moving party. See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992). Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims. Id. Because he has failed to do so, SFIC is entitled to judgment as a matter of law on the issue of statutory penalties.

III.
*A.*

The Court next considers whether, as SFIC contends, the plaintiff's bat-related damages are unambiguously excluded from coverage under the policy. SFIC invokes two separate policy exclusions in support of its contention that the SFIC policy bars coverage for the plaintiff's claim for damages caused by bats and their guano.

*B.*

1. Are bats "vermin"?

The SFIC policy provides:

> **PERILS INSURED AGAINST**
> **COVERAGE A - DWELLING and**
> **COVERAGE B - OTHER STRUCTURES**
> We insure against risk of direct loss to property described in Coverages A and B only if that loss is a physical loss to property; we do not insure loss...caused by...:

11

>   ...
>
>   (7) Birds, vermin, rodents, insects or domestic animals.

No party argues that bats are birds, rodents, insects or domestic animals. But "vermin" is not defined in the policy. Accordingly, the Court resorts to case literature and consults dictionary definitions of the term in an effort to determine whether "vermin" in its plain and ordinary sense includes bats.

In endeavoring to find the generally prevailing meaning of "vermin", courts have consulted a sampling of dictionary definitions, including:

- A noxious or mischievous animal; especially, noxious little animals or inspects, collectively as squirrels, rats, mice, fleas, lice, bugs, etc.[4]
- Any of various small animals or inspects that are destructive, annoying, or injurious to health, cockroaches or rats.[5]
- Noxious, objectionable or disgusting animals collectively, especially those of small size that appear commonly and are difficult to control, as fleas, lice, bedbugs, cockroaches, mice, and rats.[6]
- Any of a number of small animals with filthy, destructive, troublesome habits as flies, lice, bedbugs, mice, rats, and weasels.[7]

---

[4] Christ Episcopal Church of Bastrop v. Church Ins. Co., 731 So.2d 1071, 1074 (La.App. 2 Cir. 1999)(quoting *Webster's Revised Unabridged Dictionary*).

[5] Id. (quoting *The American Heritage Dictionary of the English Language*).

[6] Id. (quoting *Random House Dictionary of the English Language, Unabridged*).

[7] Gregory v. Nationwide Mut. Ins. Co., No. 10-1872, 2012 WL 6651342, at * 4 (E.D. Cal. Dec. 19, 2012)(quoting *Webster's Dictionary*).

These definitions provide varying connotations.  Not surprisingly some courts have determined that the term "vermin" is unambiguous, while others find the term to be ambiguous.  In <u>Christ Episcopal Church of Bastrop v. Church Ins. Co.</u>, 731 So.2d 1071, 1074 (La.App. 2 Cir. 1999), in considering whether, as a matter of first impression, rats and mice constitute "vermin", the court concluded that indeed they did; the court considered "vermin" to be unambiguous "as relating to mice and rats."  In <u>Gregory v. Nationwide Mut. Ins. Co.</u>, No. 10-1872, 2012 WL 6651342 (E.D. Cal. Dec. 19, 2012), the court determined that the plaintiffs failed to make an objectively reasonable showing that mites are not vermin within the context of the entire policy.  On the other hand, courts have determined that "vermin" is ambiguous as it relates to creatures that are not universally recognized as "destructive, annoying, or injurious to health" or "noxious, objectionable or disgusting."  <u>Id.</u> (citing cases); <u>see</u> <u>Jones v. American Economy Ins. Co.</u>, 672 S.W.2d 879 (Tex. App. 5th Distr. 1984)("vermin" was ambiguous; did not include squirrels); <u>Umanoff v. Nationwide Mut. Fire Ins. Co.</u>, 110 Misc. 2d 474, 442 N.Y.S. 2d 892 (N.Y. City Civ. Ct. 1981)(vermin "is ambiguous and capable of a definition which would not include raccoons"); <u>Sincoff v. Liberty Mut. Fire Ins. Co.</u>, 11 N.Y.2d 386, 183 N.E.2d 899, 230 N.Y.S.2d 13 (1962)(vermin is capable of more than one meaning and, therefore, resolving the meaning in favor of the insured, carpet beetles are not vermin);

13

North British & Mercantile Ins. Co. v. Mercer, 211 Ga. 161, 84 S.E.2d 570 (1954)(squirrels are not vermin); cf. Marks v. Trinity Universal Ins. Co., 531 So.2d 516 (La.App. 2 Cir. 1988)(noting that trial court ruled that vermin exclusion did not unambiguously exclude property damage caused by raccoon).

Notably, experts well versed in entomology disagree as to the meaning of vermin and, quite obviously, the term is not a scientific one but, rather, "is a popular colloquial expression with loose and varied popular dictionary definitions." Sincoff v. Liberty Mut. Fire Ins. Co., 11 N.Y.2d 386, 183 N.E.2d 899, 230 N.Y.S.2d 13 (1962).  Even if SFIC persuaded the Court that it should consider designating all bothersome creatures as vermin, it begs the question: bothersome to whom?[8]  The meaning of vermin is not scientifically based and suffers from being defined in subjective terms.  Moreover, in addition to "vermin", the exclusion states that damage is excluded if caused by birds, rodents, insects or domestic animals.  But the dictionary definitions would seem to include rodents and at least some insects as "vermin."  The insurer could have included in their exclusion a long list of mammals, reptiles, rodents, rather than leave virtually undefined a certain category of animals and insects that are not covered by the policy.  Using the word "vermin", whose scope is undefined, leaves the

---

[8]Clearly, an insured making a claim under his policy is doing so because he has been bothered.

exclusion open to arbitrary interpretation: one could arbitrarily conclude, based on the definition of vermin and the case literature, that skunks, opossums, and snakes are vermin, but not bats or frogs, or that any animal or insect that gets in the house is vermin.  In short, there is no clear understanding as to what constitutes vermin and what does not; under the clear rules of construction, the insurer cannot benefit from deliberate ambiguity or use equivocal terms.  Thus, because the word "vermin" is capable of more than one reasonable interpretation, it is ambiguous.  It is therefore construed against SFIC and in favor of coverage.

    2.   Is bat guano "waste"?

**PERILS INSURED AGAINST**
**COVERAGE A - DWELLING and**
**COVERAGE B - OTHER STRUCTURES**
We insure against risk of direct loss to property described in Coverages A and B only if that loss is a physical loss to property; we do not insure loss...caused by...:

...

    (5) Discharge, dispersal, seepage, migration release or escape of pollutants.
Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed.

This exclusion presents another interpretation dispute.  In invoking the "pollution" exclusion, SFIC contends that the plaintiff's damages were caused by bat guano and urine, which are odorous and should be considered "waste" or "pollution" under the

policy's pollutant exclusion. The plaintiff counters that the damages caused by bat urine and guano are not excluded as "waste", which though not specifically defined by the policy nonetheless "includes materials to be recycled, reconditioned or reclaimed." The common sense reading of "waste", the plaintiff proposes, is that of trash, refuse, or other materials discarded by humans. And the common sense reading of "pollutants" appears to refer to environmental contaminants rather than the byproducts of animals such as bats. It is true that, most commonly in scrutinizing such policy exclusions, courts consider relatively straightforward issues such as whether exposure to certain fumes or chemicals constitute "pollutants." See, e.g., Nautilus Ins. Co. v. Country Oaks Apartments, Ltd., 566 F.3d 452 (5th Cir. 2009)(carbon monoxide constituted "pollutant" and was "discharged" within the meaning of the exclusion). However, it does not follow that the scope of "pollutants" and "waste" is limited to chemicals. To the contrary, the plain, ordinary and generally prevailing meaning of "pollutants" and "waste" in the context of this common policy exclusion contemplates a rather expansive scope of materials, including waste products or other impure or unclean materials that contaminate or render an environment harmful or unsuitable for a specific purpose.[9] And, contrary to the plaintiff's cramped view, common sense teaches that pollutants may be artificial or naturally

---

[9] See *The American Heritage Dictionary*.

occurring.[10]

There is no binding authority addressing the issue of whether bat guano, or any animal or human waste, constitutes "waste" or "pollution" in the context of the relevant exclusion. However, there is persuasive authority holding that bat guano is a pollutant in the context of an identical policy exclusion. The Court agrees that a common sense reading of waste and pollutants includes excrement.

In Hirchhorn v. Auto-Owners Ins. Co., 338 Wis.2d 761, 809 N.W.d 529 (2012), the insureds' vacation home became uninhabitable and unsaleable as a result of the accumulation of bat guano between the home's siding and walls.[11] In denying coverage, the insurer invoked the policy's pollutants exclusion.[12] The Wisconsin Supreme Court determined that bat guano falls unambiguously within the policy's definition of pollutants, finding that it is an irritant

---

[10] In a more generic understanding of pollution, the air might be polluted by chemicals and the water might be polluted by sewage and other waste.

[11] The insureds noticed a "penetrating and offensive odor emanating from the home." The contractor determined that the cause of the odor was the accumulation of bat guano between the siding and the walls. The contractor submitted a remediation estimate but could not guarantee that cleaning up the bat guano would rid the house of the odor. Id. at 766. The insureds demolished their house rather than attempting to make it habitable again. Id.

[12] The insurer argued that even if the insureds' loss fell within the initial grant of coverage, it was nevertheless excluded under the maintenance exclusion clause, the vermin exclusion clause, and the pollution exclusion clause. Id. at 768.

or contaminant: "[b]at guano, composed of bat feces and urine, is or threatens to be a solid, liquid, or gaseous irritant or contaminant...bat guano and its attendant odor make impure or unclean the surrounding ground and air space...and can cause inflammation, soreness, or irritability of a person's lungs or skin." Id. at 777 (citations and internal quotations omitted).[13] The court next determined that, under the plain terms of the policy, the alleged loss occurred as a result of the discharge, release, or migration of the bat guano. Id. at 781-82 (observing that "[t]he bat guano, deposited and once contained between the home's siding and walls, emitted a foul odor that spread throughout the inside of the home, infesting it to the point of destruction").

This common sense analysis, though not binding, applies here, where the Court confronts the identical policy exclusion in the identical context of damage caused by bat guano. Bat guano, which is composed of feces and urine, constitutes waste, which is commonly understood to mean, among other things, "[t]he undigested

---

[13]The Wisconsin Supreme Court cited the Center for Disease Control's observations that:

> People who live around large quantities of bat wastes are more likely to become ill with histoplasmosis[.] People who contact mites that live in bat wastes may get skin rashes[.] Molds that grow in moist, warm, highly organic situations may increase asthma attacks in affected people[.]

Id. (citation omitted).

residue of food eliminated from the body; excrement." Id. (citing *American Heritage Dictionary* 2016).  Concomitantly, the ordinary meaning of "feces" is "[w]aste matter eliminated from the bowels; excrement" and the ordinary meaning of "urine" is "[t]he waste product secreted by the kidneys...." Id. (citing *American Heritage Dictionary* 668, 1965).  The record shows that the bat guano (and its attendant odor), clearly a "waste" or "contaminant" seeped or migrated from the bat colony's roosting place within the walls and attic down the walls and into the insulation within the walls. Under the plain terms of the pollutant policy exclusion, the Court finds that the exclusion unambiguously applies to exclude coverage for the damage caused by the bat guano.[14]

Accordingly, SFIC's motion for summary judgment is GRANTED. The plaintiff's case is hereby dismissed.

New Orleans, Louisiana, June 19, 2013

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

[14] Cf. First Baptist Church of Mauriceville v. Guideone Mutual Ins. Co., No. 07-988, 2009 WL 415482, at *4-5 (E.D. Tex. Feb. 17, 2009)(observing that "[r]aw sewage seems to easily fit within the ordinary and generally accepted meaning of waste...").